UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:21-CR-596-BAH |
| v. ) | |
| ) | |
| JEAN LAVIN ) | April 7, 2022 |

# DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

On January 11, 2022, both Defendant Jean Lavin and her daughter pled guilty to one count of the four-count Information previously filed by the Government, the charge being Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). On April 22, 2022, Ms. Lavin will appear before the Court for sentencing. She asks for no prison time, consistent with sentences imposed in similar cases arising from January 6th, with a period of probation that includes conditions the Court deems necessary pursuant to 18 U.S.C. § 3553(a). She intends to pay her restitution and special assessment that day.

In considering the parsimony clause and the factors set forth in 18 U.S.C. § 3553(a), certain facts stand out. Before January 6, 2021, Ms. Lavin was a good citizen. She worked, she took care of family, and she helped people and animals.

On January 6, 2021, she started the day with intentions that are consistent with the foundations of America. She traveled with her daughter from her home state to the Nation's Capital to see the President speak and hold a sign to show her support. Other than attending the rally and riding the bus to and from, she had no plans and no expectations for that day.

When the bus arrived too late to see the President speak and dropped them off towards the Capitol, she continued on that path of gathering with supporters, following crowds to the Capitol. At some point, she likely stepped onto a restricted area on the Capitol grounds, but there were no signs at that point, and thousands were gathering.

There came a point where Ms. Lavin made a wrong choice. She followed her daughter up a bike-rack-barrier-turned-ladder, which is not a physical feat intimidating to her given her work history, to get to a landing on the Senate steps. Ms. Lavin went up the steps, shielded from seeing the activity in the center exterior of the Capitol by the covered awnings in place for the inauguration and the throngs of people making their way together.

She decided to go inside, where she paraded and picketed, sign in hand, until she stopped. When law enforcement prevented her crowd from leaving the Senate Crypt in the direction the crowd seemingly was headed, the crowd dissipated, including Ms. Lavin and her daughter. They meandered, spending most of the rest of their time in the Orientation Lobby area, where, pre-pandemic, tourists regularly lined up for tours of the Capitol. They saw a man pepper spray a Capitol security officer and get taken to the ground. Ms. Lavin fell. She decided to leave, and after having to turn back initially into the building when another breakthrough was occurring at the Senate Wing doors that they tried to exit, she did so, making her way to the bus meeting location.

After January 6, 2021, Ms. Lavin was a good citizen. She worked, she took care of family, and she helped people and animals. She also answered law enforcement's questions, got arrested at her home in September, appeared in court as directed, and accepted responsibility.

As discussed below, Ms. Lavin's history and characteristics weigh heavily against the need for prison. Ms. Lavin learned from this experience, and she is extremely unlikely to let herself be in such circumstances again, let alone engage in the conduct that she committed. That said, she understands there will be consequences and is ready to accept them.

### **JEAN LAVIN**

At 57 years old, Jean Lavin has spent her life working, taking care of her home, her community, and her family, and engaging with people. She has a steady work history in the same industry that traces back to 1988 for virtually the same company for decades. PSR, ¶ 57. In her job, she has climbed 40-foot telephone poles and interacted with homeowners, businesspeople, transportation workers, and homeowners.[1]

When not working, Ms. Lavin often can be found at home, working in her garden, playing with her dogs, or welcoming visitors. When counsel sent an investigator to meet with Ms. Lavin at her home to get a better understanding of her background, Ms. Lavin greeted her guest with a cake that she had made for them to share. She is known to help neighbors, animals in need, and people in crisis.

Ms. Lavin historically has put her family first. Raised by a former U.S. Marine and a supportive mother, Ms. Lavin carried out their dual approach of discipline and support in trying to raise her daughter. She remains bonded to her parents, often providing them with assistance as they endure the decline that comes with aging. She

---

[1] Ms. Lavin's co-workers provided several of the letters in support submitted with this memorandum. To protect personal and workplace privacy, counsel has redacted the names of the employers, phone numbers, signatures, and addresses, to the extent appropriate. An unredacted set has been provided to the Government.

3

hopes to maintain strong ties with her daughter, but recognizes the burden that their arrests and prosecution has placed on them.

All that might make Ms. Lavin sound like a hard-working homebody. There is some truth in that, but she also makes a point of participating in her community and supporting her causes. She lost a relative in law enforcement in connection with 9/11, and she has since engaged in causes supportive of that community specifically and law enforcement more broadly. She is a proud union member, supporting her union regularly, including at rallies and protests.

And when she goes to rallies and protests, she historically has brought signs. She fashions them from posterboard, magic markers, and skinny, wooden dowel rods. At the gathering, she holds them in the air, typically showing her support for those gathered.

## JEAN LAVIN AND JANUARY 6TH

On January 6, 2021, Ms. Lavin brought a homemade sign onto a coach bus and traveled with her daughter to Washington, D.C., to hear President Trump speak. She had seen a post on Facebook about the bus trip, contacted the poster, and met at a DMV parking lot in the early morning hours with strangers for the 6-plus hour bus ride to D.C. The bus got off the highway at one point and seemingly meandered New York streets, so the trip took longer.

The bus arrived later than hoped. The passengers missed President Trump's speech. The bus dropped off the passengers away from the White House's Ellipse, where people had gathered to hear the speakers, and towards the Capitol.

When Ms. Lavin and her daughter stepped off the bus, people already were moving towards and gathering in front of the Capitol. The two milled along and

followed. They ended up in the crowd of people near the bottom of the Senate steps, shielded to some degree from the activity at the center by the large, covered awnings that had been assembled for the inauguration. People waved flags, held signs, and interacted.

The scene got rowdy. Bangs could be heard. There was a foul smell in the air, possibly from tear gas. The crowd on the Senate steps began moving up, and Ms. Lavin and her daughter joined the flow of people. Her daughter climbed a bike-rack-style barrier that had been turned sideways to reach a landing near the bottom of the steps, and Ms. Lavin, who had spent part of her career climbing structures outdoors, followed, passing up her sign to her daughter and getting it back when she reached the landing.

The two made it to the top of the steps, where the crowd seemingly carried people along to the top. At the top, the space opened into a veranda. There, Ms. Lavin made the choice that likely resulted in her having a criminal record.

Specifically, Ms. Lavin, sign in hand, followed the people entering the Senate Wing through the Senate Wing doors, at about 2:24 p.m. Her sign, bearing "Trump Won" on one side and "Don't allow 7 states of cheaters to hijack our election!" on the other, made her readily visible to security cameras as she entered, seemingly chanting along with others, and made the 50/50 decision to turn right. Others who entered previously, including those who broke through the two side windows at the doors, turned left, potentially aware that that was the route to the Senate Chamber. Ms. Lavin, who had never been in the Capitol previously, turned right, heading to the center of the building.

Within minutes, she found herself in the back of a crowd of people in a circular room with columns and some statutes along the periphery, the Senate Crypt. The crowd stopped her forward progress, and more people filled in behind her. Eventually, within

minutes, having pushed through a line of Capitol security officers, the crowd began moving forward, crossing the large room. Ms. Lavin went with the crowd, passing the first officers she noticed in the Capitol.

The movement was brief. Officers at the other end of the space prevented people from exiting in that direction. After a few more minutes, the crowd began to dissipate, Ms. Lavin and her daughter included. The two left that area at about 2:30 p.m. and found their way down stairs and into a wide open area, the Orientation Lobby, with comparatively fewer people around them. Capitol security and police appeared to interact peacefully with the trespassers and the two moved around a bit. They went up an escalator, encountered a security officer who told them to go back down, and so they did.

Two things happened not long after that prompted them to leave the building. First, back in the Orientation Lobby with security and others, they largely watched others and, to some extent, interacted. A trespasser, seemingly unprovoked, pepper sprayed a Capitol security officer. The offender was taken to the ground by a group of officers. Second, Ms. Lavin fell.

At about 2:43 p.m., the two made their way back to the vestibule inside the Senate Wing doors. Capitol security had gained control at some point in the interim, but a crowd was again pushing for entry. At about 2:48 p.m., Ms. Lavin and her daughter watched from an entrance to the vestibule where they waited, hoping to leave. The crowd breached the officers, and Ms. Lavin and her daughter were prompted to re-enter further into the Capitol again.

That trip was minutes long. Video of the area inside the Senate Wing doors at about 2:56 p.m. shows a sea of people crowded together minutes after the second breach,

wherein Ms. Lavin's sign, and to some extent Ms. Lavin and her daughter, can be seen moving to the door and then leaving the building. Her time inside the Capitol was approximately 32 minutes long.

Ms. Lavin entered the building unlawfully and paraded. The pepper spray incident and then, while leaving the Capitol or outside, hearing word that a person had been shot were jarring. She realized that a protest had turned darker, the wrongness of her presence in the building started to materialize, and her guilt about having brought her daughter with her began to set in. A day that began with her wanting to support her President at a political rally had become something she had not expected and left her questioning herself and the motives of those around her.

## THE AFTERMATH

In the days that followed, her concern grew. She became aware of events at the Capitol that occurred in other locations, including the loss of life and harm to law enforcement officers. She knew that repercussions would follow, and she and her daughter decided to stop talking about it with others. Her daughter took down a Facebook post that she had made and that would revisit them later in the year.

On or about June 15, 2021, FBI task force officers interviewed Ms. Lavin and her daughter at her home. Ms. Lavin did not ask for a lawyer to be present. She explained how they had signed up for a bus trip to see President Trump speak on January 6, traveling all on one day. She recalled her clothing and noted her sign that said "Trump Won," explaining that the handle was from a Swiffer brand mop handle. She indicated that they had no plan to go into the Capitol when they went to D.C. or at any point before they were actually making their way to the doors. They were not aware of any plans to

do so.  She stated that "she would not attend the event knowing what she does now" and she was "shocked by what she saw," especially given her experiences at rallies previously.  She "would not be returning to D.C."  The reporting officer noted that Ms. Lavin "was cooperative and acted appropriately during the interview."

On September 14, 2021, law enforcement arrived at Ms. Lavin's and her daughter's home.  She was at work, but she got a frantic call that law enforcement was there.  She went home and did what she could to help law enforcement find the objects on their list.  Based on the June interview, she had expected that she would be contacted if there were more discussion to be had, rather than be surprised with an arrest warrant; she would have surrendered had she been directed to do so.  Instead, she was cuffed and driven to the federal courthouse in Hartford, about 40 miles away from her hometown.

Media coverage was widespread.  News reports could be heard on every local channel, TV and radio, likely spurred further by the mother-daughter relationship.  In today's world, seemingly every news post on the Internet or social media cites offers a forum for comments, wherein many wrote about Ms. Lavin being an awful mother and how she should go to jail.

Released on conditions, Ms. Lavin went home from the courthouse to news teams in front of her home.  That dissipated over time, and she did what she had done every day prior to January 6th and every day after.  She worked, she spent time helping her parents, and she took care of her dogs and her home.

Ms. Lavin also quickly decided to take responsibility for parading unlawfully in the Capitol.  On January 11, 2022, both she and her daughter pled guilty to one count of the four-count Information, the charge being Parading, Demonstrating, or Picketing in a

8

Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). The plea documents included a lengthy Statement of Offense and her agreement to cooperate with law enforcement as requested. She already had agreed to enable her cell phone to be duplicated without subsequent evidentiary challenge.

## **SENTENCING**

Ms. Lavin's case is not an isolated one. Hundreds of defendants have been prosecuted, and trials are underway. There are nearly too many cases to compare, other than the basics of admitted charge, the Government's request, and the outcome. A closer look can point a reference point or two.

For example, in *United States v. Lollis*, No. 1:21-cr-671-BAH, the Court imposed a term of probation of 36 months, starting with three months of home confinement and 100 hours of community service to be completed in the first year, along with the obligations to pay $500 in restitution and a $10 special assessment. *See id.*, Judgement, ECF No. 32. According to the Government, Mr. Lollis, like Ms. Lavin, had entered through the Senate Wing door, but he also "asked a police officer who was attempting to maintain order at the Capitol on January 6 whether he was on the "same team," suggesting that he should not try to stop them, then taunted the officer when he did not respond; and . . . did not disperse after leaving the Capitol Building, but rather joined other rioters who had amassed at the Lower West Terrace entrance to the Capitol Building, where some of the most violent attacks on police occurred that day." *Id.*¸Gov't Memo, ECF No. 24, at 1-2. Mr. Lollis had brought a gun to his hotel where he stayed outside D.C. on January 5th with a fellow traveler from South Carolina, but left it there on January 6th. *See id.* at 3. He entered the Capitol at 3:22 p.m., placing a sticker on the

9

wall that had been handed to him before entering the building. *See id.* Based on timing and photos provided in that case, he likely was in the group that entered after pushing through the officers, as witnessed by Ms. Lavin when she was trying to leave. *See id.* at 4. Mr. Lollis did not stay inside long, for only about 5 minutes. *See id.*

While there are commonalities between Ms. Lavin and Mr. Lollis, and Ms. Lavin was inside longer, there are important distinctions. Ms. Lavin did not confront law enforcement about being on the same team, she did not put a sticker on the Capitol walls, she did not bring a firearm with her on the trip, and she did not join the rioters when she left the building. Prison was not warranted for Mr. Lollis, and it clearly is not warranted for Ms. Lavin. A period of probation plainly is warranted and consistent with sentences imposed in numerous misdemeanor January 6 cases.

Indeed, prison time likely would cost Ms. Lavin her job. At age 57, any loss of employment likely would be a point from which she could not fully recover. The experience of arrest, widespread stigmatization through media coverage (which is likely to occur again in connection with sentencing), spending time under court supervision, and dealing with media inquiries and harassment all have served to punish her. Plus, she will have a criminal record once the Court enters the judgment in this case, finalizing the conviction, and then she anticipates she will continue to be supervised by the Probaiton Office in the District of Connecticut. Prison time is not necessary.

The circumstances of January 6th arguably are among the most serious domestic events in the country's history. The events that transpired that day were not among ones that Ms. Lavin foresaw or even contemplated. She thought she was going to a political rally. She recognizes the wrongness of her decisions and the danger that comes when a

crowd turns into a mob and loud protest shifts into a riot. She now bears the label of having been part of something that she would never condone. The Court can reasonably expect that Ms. Lavin will not find herself in these circumstances again.

## **CONCLUSION**

For all the reasons stated herein, Ms. Lavin requests that the Court impose a term of probation with those conditions that the Court deems sufficient, but not greater than necessary, to promote Ms. Lavin's continuing the law-abiding life from which she strayed on January 6, 2021.

Respectfully submitted,
JEAN LAVIN

/s/Charles F. Willson/s/_____
By Charles F. Willson (# ct24129)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel:   (860) 493-6260
Fax:   (860) 493-6269
email: Charles_Willson@fd.org

## **CERTIFICATION OF SERVICE**

      This is to certify that on April 7, 2022, a copy of the foregoing was filed with the Court via the CM/ECF system, by which counsel to all parties, including the Government, will be notified of and have the opportunity to review this filing.

<u>/s/Charles F. Willson/s/</u>
Charles F. Willson