# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00596-002 (BAH)** |
| **v.** | : | |
| | : | |
| **JEAN LAVIN,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jean Lavin to 14 days incarceration, 36 months of probation and $500 in restitution.

### I.      Introduction

The defendant, Jean Lavin and her co-defendant and daughter, Carla Krzywicki,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Jean Lavin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration and probation is appropriate in this case because Lavin: (1)  repurposed a bicycle rack from a barricade to a ladder to access the Capitol Building; (2) spent approximately 32 minutes inside the

---

[1] Ms. Krzywicki also pleaded guilty to Parading, Demonstrating or Picketing in a Capitol Building and is also awaiting sentencing before this Court.  *See United States v. Krzywicki*, 21-cr-00596-01.

Capitol during the riot; (3) joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; (4) witnessed violence against police officers on the West Front, in the Crypt, in the Crypt Annex and in the Northwest Corridor, yet continued to participate in the riot; and (5) minimized her conduct when interviewed by FBI agents.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed to delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, Lavin's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of incarceration and probation both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 47 (Statement of Offense), at 1-4. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them.

The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.





With that backdrop we turn to Lavin's conduct and behavior on January 6.\

*Jean Lavin's Role in the January 6, 2021 Attack on the Capitol*

Early in the morning of January 6, 2021, Jean Lavin and her adult daughter, Carla Krzywicki, traveled by bus to Washington, D.C. from their home in Connecticut to attend the "Stop the Steal" rally. Lavin wore a red jacket, a pink shirt, a pink hat and carried a purple backpack.  She carried a homemade sign that had two American flags attached to it that read on one side, "Trump Won" and read on the opposite side, "Don't allow 7 states of cheaters to hijack our election!"

Their bus driver got lost in the New York City area, resulting in a late arrival to Washington, D.C. and the pair missed then-President Trump's speech.  Lavin and her daughter followed the crowd to the Capitol grounds, entering the grounds at the Peace Circle at approximately 1:22 p.m. where the pair went around the first pedestrian barricade.

 By 2:00 p.m., Lavin and her daughter were on the West Front of the Capitol Building, where a crowd of violent rioters had assembled, as pictured, *supra*. U.S. Capitol Police formed a line of bike racks extending from the north end of the West Front to the south end to act as a barrier against the crowd. Officers were standing watch behind this line and fending off repeated attempts by the rioters to topple the bike racks, either with their hands or with ropes and straps.

At approximately 2:00 p.m., Lavin witnessed rioters directly in front of her shove Metropolitan Police Officers who had arrived at the West Plaza to the Capitol.  Rioters standing right next to Lavin shouted at police, "You fucking fraud!  You fucking traitors!" while an alarm blared.



At approximately 2:16 p.m., Krzywicki climbed up a bike rack that rioters had repurposed from barricades to ladders and placed against the Capitol terraces, allowing them to access the Capitol building.  Upon reaching the top, she turned and took her mother's sign. Lavin then climbed up the bike rack.



Lavin and Krzywicki climbed the northwest stairs near the inauguration stage, bringing them to the northwest courtyard at approximately 2:22 p.m.  Lavin and her daughter entered the Capitol building through the Senate Wing Door at approximately 2:24 p.m., about eleven minutes

after the initial and violent breach of the building at that door.  Lavin noted that upon her entry, the door and windows were already damaged.



They lingered briefly in the northwest corridor and then turned right, proceeding into the Crypt.  There, U.S. Capitol Police officers had formed a line, blocking the rioters from advancing further into the building.  But rioters continued streaming into the Crypt, quickly outnumbering the officers and pushing past them.  Though not at the front, Lavin and her daughter formed part of this critical mass.



The pair turned east and proceeded down to the Crypt Annex at approximately 2:30 p.m.



Lavin and her daughter then went down to Emancipation Hall Upper Lobby, the link between the Crypt and the subterranean visitor's center, where they remained for approximately 5 minutes.



Lavin and Krzywicki returned upstairs to the Crypt Annex at approximately 2:37 p.m., where they witnessed a fight between rioters and police at approximately 2:40 p.m.  The pair watched police subdue a rioter and it appeared Krzywicki recorded the incident with her phone.





At approxmately 2:48 p.m., they returned to the Northwest Corridor near the Senate Wing Door, where they witnessed the violent second breach of the door by rioters, which involved rioters pushing against a group of police officers using their bodies to hold the rioters out of the building.  This caused the pair to retreat back down the corridor.

As the corridor filled up with more rioters who had freshly gained access to the building, Lavin and Krzywicki moved toward the Senate Wing Door, milling in the corridor and as surviellnace video shows, chanting.  The pair stopped for Krzywicki to take a photograph that she later posted to her Facebook page (depicted below on the right of the post) with the caption, "This is history.  we do not go burning down your city and stealing from your business. we come for the government officials that are ruining our country.  we go straight to the source.  change needs to happen.  that is our house and you work for us."



Lavin and Krzywicki exited the Capitol through the Senate Wing Door at approximately

2:56 p.m.

---

[2] The "selfie" photograph on the left of the post was taken in front of the Senate steps on the East Front of the Capitol at approximately 3:32 p.m. after they had left the Capitol Building.



In total, Lavin and her daughter spent just over 30 minutes inside of the Capitol, during which time they witnessed much violence between police and rioters. Lavin has admitted that she knew at the time she entered the U.S. Capitol Building that she did not have permission to do so, and she engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Lavin's FBI Interview*

On June 23, 2021, the FBI interviewed Lavin at her home.  Lavin stated she and her daughter entered the Capitol building for approximately less than one hour, then left for approximately twenty minutes and returned inside the Capitol building for approximately 20 minutes more before leaving again.[3]  Lavin stated they entered the Capitol just to look around out of curiosity.  Lavin denied posting anything on social media from the event but said she may have sent pictures to friends later.

---

[3] Geolocation from the defendant's phone shows she only entered the Capitol once on January 6 and the government has not been able to locate any video evidence of a second entrance.  The government believes that the defendant mistakenly thought that by going down to Emancipation Hall, she had left the Capitol only to return when she went back upstairs.  In fact, Emancipation Hall is part of the Capitol Building and was part of the restricted area on January 6.

During the voluntary interview, Lavin sought to minimize her involvement in the riot with statements that are contradicted by video evidence.  Specifically, Lavin stated she and her daughter saw others entering the Capitol and the police seemed to be allowing people to enter.  However, there was significant violence against police on the West Plaza, police employed flashbang grenades and tear gas to disperse the crowd, of which Lavin was part.  Lavin advised she observed a man pepper-spray police who was then arrested.  Further, once inside the Capitol, Lavin observed multiple instances of assaults on police by rioters, though she did not participate in any.

Lavin told the FBI that the use of tear gas served to agitate the otherwise peaceful crowd causing them to turn violent, again casting blame for January 6 from herself and other rioters to the overwhelmed police.

### The Charges and Plea Agreement

On September 9, 2021, Jean Lavin was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 14, 2021, she was arrested at her home in Connecticut.  On September 23, 2021, the United States Attorney's Office filed an Information charging Lavin in four counts.  On January 11, 2022, she pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, Jean Lavin agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Lavin now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Lavin faces up to six months of imprisonment, up to five years of probation and a fine of up to $5,000. Lavin must also pay

12

restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

For the reasons described below, a sentence of 14 days incarceration, 36 months of probation and $500 in restitution is appropriate in Lavin's case.

Lavin agreed under the terms of the plea agreement to pay $500 in restitution. The government has previously briefed the restitution issue before this Court in relation to *United States v. Torrens*, 21-cr-204, ECF 99. The numbers for restitution have slightly changed. In response to the Court's request, the updated calculations on restitution are set forth as follows:

| | |
|---|---|
| Architect of the Capitol | $1,234,354.01 |
| House Chief Administrative Officer | $338,294.83 |
| Secretary of the Senate | $32,075.00 |
| Senate Sargent at Arms | $79,490.05 |
| Total | $1,574,213.89 |

Capitol Police:

| | |
|---|---|
| Lost and Damaged Property | $41,719.90 |
| Medical Payments | $73,719.55 |
| Continuation of Pay (COP)/Workers Compensation | $1,045,129.80 |
| Total | $1,160,569.25 |

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration and probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Lavin herself stood next to other rioters who called the police "fucking traitors," used the bike racks that had been installed by police as barriers to scale a wall adjacent to the Capitol Building and then continued into the building.

Additionally, in determining a fair and just sentence on this spectrum, this Court should assess Lavin's conduct against a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged

in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Lavin personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Lavin's part is therefore not a mitigating factor in misdemeanor cases.

Lavin and her daughter used barricades to access the Capitol Building, witnessed assaults on police before she entered the Capitol and while inside the Capitol. She entered the Capitol through a broken door and windows after proceeding past barricades, through tear gas and percussion grenades, and after witnessing at least one arrest. Inside, she was a part of a mob in the Crypt that overwhelmed police to gain further access to the building. She came upon assaults on police in the Upper Orientation Lobby and at the Senate Wing Door. And after all that, she placed the blame for January 6's destruction not at the feet of herself and the other rioters, but on the police.

Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration and probation.

### B.  Lavin's History and Characteristics of

As set forth in the PSR, Lavin has a history of employment and no criminal history. ECF No. 54, ¶¶ 56-57, 28-30.  She appears to have been compliant with her conditions of pre-trial release.

Overall, Lavin has taken responsibility for her actions despite originally attempting to mitigate them when interviewed by the FBI.  The government has no evidence of social media posts by Lavin, unlike her daughter, promoting her crimes, though she may have privately shared some photographs from January 6 with friends and family. When approached by the FBI, she voluntarily told the agents about her involvement, though she sought to cast blame for the violent nature of January 6 on the police.  Lavin accepted the government's plea offer early on in this case demonstrating her acceptance of responsibility.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lavin used the violence committed by others on January 6 to promote her theory that "7 states of cheaters to hijack[ed] our election!" then sought to cast blame for the riot on police, many of whom were injured defending the Capitol that day. The government acknowledges that Lavin accepted responsibility early by entering into this plea agreement. On the other hand, her actions on Janaury 6, 2021, specifically, being adjacent to violent activity and minimizing her role, underscores the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed,

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Lavin has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating or Picketing in the Capitol, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may also consider the sentence of 36 months of probation and 14 days incarceration imposed by this Court on Glenn Croy for reference. Croy witnessed violence as he entered and spent approximately 40 minutes inside between two entrances. *See* 21-cr-162-BAH, Dkt. No. 58.  The Court may also consider the sentence of 3 months' home detention and three years' probation imposed by this Court on Eric Torrens for reference.  Torrens entered through the Senate Wing Door, saw members of the crowd attack law enforcement, was part of the horde in the Crypt and spent about 10 minutes inside the Capitol.  *See* 21-cr-204-02-BAH, Dkt. No. 133.  Lavin observed violence against police prior to entering and in the Capitol on multiple occasions yet still spent more than 30 minutes inside, including chanting soon after witnesses more rioters violently force entry.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).    Two provisions—one from

subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

     *2.  Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Lavin pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"
to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983
WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over
weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"
such as "for a week or two."  *Id.*[9]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the
statutory maximum) as a condition of probation, so long as the imprisonment occurs during
"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does
not define an "interval of time," limited case law suggests that it should amount to a "brief period"
of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,
at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above
and reversing magistrate's sentence that included 30-day period of confinement as a condition of
probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,
2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation
was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous
60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404,
at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Lavin's case given the requested 14-day imprisonment sentence.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jean Lavin to 14 days incarceration, 36 months of probation and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov